Walton W. GRIFFITH et al., Appellants,

v.

Harry MAURITZ et al., Appellees.

No. 13142.

Court of Civil Appeals of Texas.

Houston.

Dec. 5, 1957.

Appellees' Motion for Rehearing Denied Jan. 9, 1958.

Fortney & Carter, Gerald H. Fortney, Baytown, for appellant.

Guittard & Henderson, Frank Guittard, Victoria, P. R. Rowe, Houston, for appellee.

WERLEIN, Justice.

This suit was brought by appellees, Harry Mauritz et al., against Walton W. Griffith, Kerry O. Griffith, Raymond L. Griffith, J. W. Griffith, Vernon R. Griffith, R. P. Clements, J. S. Trahan, and Jimmy Trahan, defendants, for damages and an injunction restraining defendants, and each of them, jointly and severally, from placing, keeping or pasturing more cattle and/or other livestock in the west enclosure of the "Triple T Pasture", than the tract or tracts owned by the defendants, respectively, within such west enclosure, would reasonably pasture, and from other acts in connection with the grazing of such property. From a temporary injunction granted appellees, all of said defendants with the exception of J. W. Griffith and R. P. Clements, have perfected their appeal, filing a $3,000 temporary injunction bond which was duly approved. J. W. Griffith was dismissed from the case, and R. P. Clements though enjoined has not appealed.

The plaintiffs alleged that for more than 20 years immediately prior to the filing of the suit they and their predecessors in title and possession had been in continuous possession, use and occupancy of a pasture established by them and embracing approximately 2,800 acres of land known as the "Triple T Pasture" in the R. D. Moore League in Jackson County, Texas, which pasture includes a large number of tracts in the Francitas Farms Subdivision. They further alleged that during such period of their possession, use and occupancy of said Triple T Pasture they and their predecessors in title have continuously maintained same as a cattle pasture enclosed by fences and natural barriers, including the East and West Carancahua Creeks, upon and along the outside boundaries thereof, capable at all times of turning livestock; that during such time they and their predecessors had owned a large portion of said lands and held pasturage and farming leasehold rights on most of the remainder; that from time to time the Triple T Pasture had been subdivided by cross-fences constructed by or for the plaintiffs and their predecessors in title, and that the only portions of said pasture with respect to which the defendants, or any of them, have any right of ownership or possession are located within the "west enclosure" of such pasture, containing approximately 1,000 acres as described in the petition; that the defendants Griffith and Trahan, or some of them, had acquired title or leases upon certain tracts of land in the west enclosure, amounting in the aggregate to some 70.74 acres; that in recent months, beginning about January 1, 1953, said defendants, or some of them, acting separately or in concert and together, have been placing and keeping in the Triple T Pasture, in the various enclosures thereof, more cattle than the tracts of land owned or leased or claimed to be owned or leased by the defendants would reasonably pasture.

They further alleged that defendants, or some of them, are still placing and keeping in the west enclosure more cattle than the tract or tracts owned or leased by them would reasonably pasture, although at plaintiffs' insistence most of the cattle had been

moved just recently out of the portions of the Triple T Pasture lying outside of such west enclosure. They further alleged that the defendants, or some of them, acting separately and in concert with each other, had permitted cattle to feed upon and destroy crops planted by the plaintiff, Gus Lee, and had deliberately left open and unattended gates installed by plaintiffs, and had damaged fences, interfered with, obstructed, and threatened to interfere with and obstruct the plaintiffs in maintaining and preserving various fences and gates and cattleguards, and that each and all of the defendants had participated in such wrongful acts and conduct. They further alleged that the defendants, or some of them, particularly the defendant Walton W. Griffith, had granted permission for various persons to hunt, fish and camp upon the Triple T Pasture.

They asked that the defendants be restrained from the various acts alleged to have been committed by them, including the pasturing in the west enclosure of more cattle than the tract or tracts owned or leased by the defendants, respectively, within the west enclosure, would reasonably pasture; from pasturing cattle in any portion or enclosure of the Triple T Pasture other than the west enclosure, or more than 5 head of cattle in said west enclosure; from pasturing any cattle within the west enclosure while such land was being cultivated or being prepared for cultivation by the plaintiffs, or any of them, or by their present or future tenants or lessees; from leaving open and unattended any gate or altering or damaging any gate, cattleguard or fence, cross-fence, well or other property of plaintiffs; and from hindering, obstructing, interfering with or threatening plaintiffs, or any of them, in their construction or maintenance of the fences and gates; from hunting, fishing, camping or trespassing upon the property, or encouraging or causing any person to do so; and from cutting, damaging or removing any grass or hay or crop cultivated or grown by plaintiffs.

Plaintiffs' petition was sworn to. The defendants filed unsworn answers, mainly general denials.

█ Appellants in their first two points state that the trial court erred in granting a temporary injunction against them in that there was no evidence to show that the defendants did any of the things they were enjoined from doing, or that they would commit such acts in the future unless restrained by the court.

A brief summary of the testimony is necessary to determine whether there was any evidence showing that defendants had been doing the things from which they were enjoined, or would probably commit such acts in the future if not restrained.

W. W. Griffith, the father of the other Griffiths, claimed to own or to have leased a number of 5-acre tracts in the west enclosure. The evidence showed that he had no cattle of his own, but that he took in cows belonging to Mr. Clements by the month and charged him therefor. He also grazed cattle for his son, Raymond Griffith. R. P. Clements testified that he had as many as 20 head of cattle at one time grazing upon the Triple T Pasture. W. W. Griffith testified that he had some cattle in 1953 belonging to Cochran Brothers, he believed it was 66 head, in addition to the cattle of Ray Clements, making a total of 79 head of cattle at that time grazing in the Triple T Pasture.

Kerry O. Griffith, son of W. W. Griffith, lives on Tract No. 2474 in the Triple T Pasture, a short distance from the west enclosure. He claimed that within the last 2 or 3 years he had put no cattle of his own on any of the Triple T area. He grew garden crops and row crops on his tract. He had a well on his tract. He leased some pasture from his father in another area up near the Francitas townsite.

Vernon Griffith lives on Tract No. 2625 of the Francitas Farms Subdivision, which is a part of the Triple T Pasture. He claims title to Lots Nos. 2625 and 2626,

5-acre tracts, and also 2701. He admitted that he had 7 head of cattle presently grazing in the Triple T Pasture area in the west enclosure. He had had arguments and disputes with plaintiff Lee with respect to rights to pasture in the Triple T area and some blows were exchanged between them. He had built a fence in the Triple T Pasture for himself between Tracts 2576 and 2577. This fence was partially removed four or five months before this suit was filed, and the rest of it was taken down after notice of the suit. He started putting cattle in the Triple T Pasture about 1952.

Raymond Griffith, also a son of W. W. Griffith, lives in Matagorda County. In 1955 his cattle were all over the property in question. He claimed the right to pasture by reason of the 80 acres, Tract No. 2743, which he had leased from his father. He had 14 or 15 head of cattle in 1956. In 1956 his cattle ranged for a few months through the balance of the Triple T Pasture. He had participated in rounding up or gathering cattle outside of the 80 acres he leased from his father. He moved some of his cattle out around the 14th of December, 1956.

The defendant, Jimmy Trahan, claimed title to three 5-acre tracts in the west enclosure. He leased the same to W. W. Griffith, he thought for $2.50 per acre. He and his brother, J. S. Trahan, lived together at Francitas. He had no cattle, had never been engaged in the cattle business, had never put any cattle in the Triple T Pasture, and had no improvements on any of his lots except part of a fence on No. 2518. He had never lived on any of the land.

J. S. Trahan owned one Lot, No. 2500, which he leased to W. W. Griffith at $2.50 per acre. He had started to build a house on his lot but had never completed it. There are no fences around the lot and no improvements except the partially completed house. He had bought a few head of cattle, but they were put on a pasture near Francitas some miles away. He has never had any cattle in the Triple T Pasture and has never lived on any of the land.

Marcus Mauritz testified with respect to cattle being pastured down on the west enclosure in excess of what they considered the carrying capacity of the land, and also with respect to fences being erected on land which they owned or controlled. We quote the following hearsay testimony of this witness on cross-examination:

"Q. Who is that? A. The Defendants in this case.

"Q. All the Defendants? A. So far as I am concerned, yes, sir.

"Q. You know they have all been erecting fences? A. As far as I am concerned, they are all in the same thing."

A little later he was asked, "You said so far as you knew the Defendant Trahan and his defendants haven't done any of these things?" He answered, "That is what I am answering, yes." He said he was not willing, however, to dismiss the Trahans from the suit.

Harry Mauritz testified as to Mr. Lee's complaints made to him "about the Griffiths running cattle in the pasture." To the question, "Let me ask you again, was this Mr. Lee's statements that the Griffiths were putting more cattle in the west enclosure than the land would carry?", he answered in the affirmative. He was also asked, "Do you have any personal knowledge or report or information from your tenant, Mr. Gus Lee, that the Griffiths have pastured cattle on land lying within the west enclosure that they do not own or lease?" His answer was, "Well, they evidently own some land in the west pasture but according to the testimony and witnesses here they certainly are pasturing land they do not own in over-grazing or going beyond their grazing rights over in the western pasture. * * *" He further testified that Mr. Lee reported that some of the Griffiths had left a gate open.

Harry Mauritz was asked, "Do you know or have any knowledge that these Defendants have cut, damaged or removed or that they have caused to be cut, damaged or removed any grass, hay or crop planted upon lands owned and cultivated by you or your tenants?" He answered, "It would be just a matter of hearsay, Mr. Mayfield. My tenant says they have and I have no reason to doubt his word." He was asked the following question: "I would like to have the witness specify which Griffith he is speaking of when he says 'Mr. Griffith interfered.' There are several Mr. Griffiths." Answer: "Well, I think it has kind of developed into where it is more of a family affair and when we hear of a Griffith no matter which one figures—".

The court, in the order granting the temporary injunction, found that the plaintiffs had made a proper showing of probable right, probable irreparable injury and damage of such nature as to entitle them to the temporary injunction; that they and their predecessors in title and possession had for many years held and continued to hold prior possession of the entire Triple T Pasture, including the west enclosure, and all other portions of the Triple T Pasture, and that their ownership or leases comprised in the aggregate all of the Triple T Pasture including the west enclosure thereof except for certain scattered separate tracts amounting to not more than 60.74 acres located within the west enclosure owned or leased by certain of the defendants, and held for grazing, pasturage and farming purposes by the defendants, W. W. Griffith and Vernon R. Griffith. The court further found that the defendants, W. W. Griffith and Vernon R. Griffith, acting together or separately, had pastured more cattle in the west enclosure than the same would reasonably pasture, and that Vernon R. Griffith and Ray Clements had interfered with and threatened to interfere with plaintiffs' maintenance and operation of the Triple T Pasture and the west enclosure thereof, and had been guilty of the acts and conduct of a character or similar

nature to those enjoined. The court further found that there was reason in the evidence to believe, and the court found, that it is probable that the defendants, Raymond L. Griffith, Kerry O. Griffith, J. S. Trahan and Jimmy Trahan and Ray Clements, had directly or indirectly participated in, or at least had aided, abetted, assisted and encouraged the defendants, Walton W. Griffith and Vernon R. Griffith, in their wrongful acts.

From a careful reading of the statement of facts, it is our opinion that the court was well warranted in enjoining the defendants, Walton W. Griffith, Kerry O. Griffith, Raymond L. Griffith, Vernon R. Griffith and Ray Clements, from jointly and severally, or from indirectly or directly doing or causing or allowing any of their agents, servants, employees, etc., to do, directly or indirectly, the various matters contained in the eight paragraphs enjoining said defendants. However, we are further of the opinion that there was no evidence which would justify enjoining the defendants, J. S. Trahan, and Jimmy Trahan, as there was no evidence which showed that they were in any way committing the acts enjoined or aiding or abetting the same, and neither of them had any cattle that ever grazed upon said Triple T Pasture, and neither of them had ever lived thereon.

In Seabrook Shipyard v. Lehrer, 297 S. W.2d 381, 383, the Fort Worth Court of Civil Appeals stated the following principles of law:

"A finding will be sustained in the appellate court if there is any substantial legal evidence upon which a trier of the facts might base it. Bussan v. Donald, Tex.Civ.App., 244 S.W.2d 271; 41-B Tex.Jur., p. 865, sec. 625. Fact findings may embody inferences deducible from the evidence.

"The findings of the trial court in a nonjury case are to be interpreted in the light of the pleadings and proof in the case, and so as, if possible, to sus-

tain the judgment rendered. Daniels v. Wight, Tex.Com.App., 249 S.W. 454; Elder, Dempster & Co. v. Weld-Neville Cotton Co., Tex.Com.App., 231 S.W. 102."

In the case of Transport Co. of Texas v. Robertson Transports, Inc., 152 Tex. 551, 261 S.W.2d 549, 552, the Supreme Court of Texas, in connection with a hearing on an application for temporary injunction, made the following statement:

"In a hearing on an application for a temporary injunction the only question before the court is the right of the applicant to a preservation of the status quo of the subject matter of the suit pending a final trial of the case on its merits. James v. E. Weinstein & Sons, Tex.Com.App., 12 S.W.2d 959, 960. To warrant the issuance of the writ, the applicant need only show a probable right and a probable injury; he is not required to establish that he will finally prevail in the litigation. Rosenfield v. Seifert, Tex.Civ.App., 270 S.W. 220, 223; Nagy v. Bennett, Tex. Civ.App., 24 S.W.2d 778, 781; High on Injunctions, 4th Edition, Vol. 1, Sec. 5, p. 8. If the party enjoined prevails on a final trial of the case he finds protection against the improvident granting of the writ and consequent loss in the interim in the applicant's bond. Where the pleadings and the evidence present a case of probable right and probable injury, the trial court is clothed with broad discretion in determining whether to issue the writ and its order will be reversed only on a showing of a clear abuse of discretion. Texas Foundries v. International Moulders & Foundry Workers' Union [151 Tex. 239], 248 S.W.2d 460, 462. There is no abuse of discretion in the issuance of a writ if the petition alleges a cause of action and the evidence adduced tends to sustain it. Southwestern Greyhound Lines, Inc., v. Railroad Commission, 128 Tex. 560, 99 S.W.2d 263, 109 A.L.R. 1235."

This Court is of the opinion that the pleadings and the evidence in the instant case present a case of probable right and probable injury, and that there was substantial evidence from which the court could find and infer that the defendants Griffith had committed or aided, or abetted in the commission of the acts enjoined, and would probably continue to do so in the future if not enjoined by the court.

Chief Justice Hickman, in the case of Texas Foundries, Inc., v. International Moulders & Foundry Workers' Union, 151 Tex. 239, 248 S.W.2d 460, 462, used this pertinent language:

"The granting or refusing of a temporary injunction is subject to a very different character of appellate review from the granting or refusing of a permanent injunction. The trial court is clothed with broad discretion in determining whether or not to issue a temporary injunction to preserve the rights of the parties pending a final trial of the case, and when that discretion is exercised its order should not be overturned unless the record discloses a clear abuse of discretion. Railroad Commission v. Shell Oil Co., 146 Tex. 286, 206 S.W.2d 235; Southwestern Greyhound Lines, Inc., v. Railroad Commission, 128 Tex. 560, 99 S.W.2d 263, 109 A.L.R. 1235; Harris County v. Bassett, Tex.Civ.App., 139 S.W.2d 180, error refused; * * *

"The test announced by this court is: 'If the petition does allege a cause of action and evidence tending to sustain such cause of action is introduced, then there is no abuse of discretion by the trial court in issuing the temporary injunction [128 Tex. 560, 99 S.W.2d 270].' * * *"

It is clear that in the instant case there was no abuse of discretion on the part of the trial court in granting the temporary injunction against the defendants Griffith, under the pleadings and the testimony in

the case, which certainly tended to sustain the cause of action alleged.

■ The appellants' third point is as follows:

"The Trial Court erred in granting said injunction against Defendants in that said injunction and every portion thereof, except paragraph No. One thereof, is vague, uncertain, and indefinite and thereby incapable of being enforced."

In connection with this point appellants claim that the court erred in enjoining them from pasturing more than 6 head of cattle or livestock at any time in said west enclosure, arguing that since there are seven defendants, each defendant would be limited to 6/7 of a cow. They further contend that paragraph 5 of the order granting the temporary injunction is typical of the vagueness and uncertainty of the order.

Paragraph 5 of the order granting the temporary injunction reads as follows:

"5. From leaving open and unattended at any time any gate heretofore or hereafter owned by or installed by or for plaintiffs, or any of them, or any of their present or future tenants on the Triple T Pasture or any present or future enclosure within the Triple T Pasture, in which the defendants or any of them may now or hereafter own or lease any tract or tracts; and from opening any gate on any portion of the Triple T Pasture in which the defendants do not own or lease any tract or tracts; and from altering, damaging or destroying any gate, cattle guard, fence, cross-fence, well or other property of the plaintiffs or any of their present or future tenants or lessees now or hereafter situated on any tract or portion of the Triple T Pasture which is not then owned or leased by the defendants respectively, or as to which the defendants, respectively, are not then entitled to possession as against the plaintiffs and their tenants; * *."

Appellants also contend that the order does not state which property the defendants are entitled to possession of within such enclosure; nor which property the plaintiffs own, claim or have possession of.

We cannot agree with appellants. The testimony shows that at the present time there are only 7 head of cattle pastured in the west enclosure belonging to the defendants, such cattle in fact belonging to the appellant, Vernon Griffith, and that the appellants have no cattle within the Triple T Pasture other than the west enclosure. The appellants testified as to the tracts which they owned or claimed, and they were certainly informed that the appellees claimed to own or lease the balance of the land, and had prior possession thereof.

Appellants rely chiefly in this connection upon the case of Villalobos v. Holguin, 146 Tex. 474, 208 S.W.2d 871, 875, in which the Supreme Court of Texas, through Justice Brewster, stated:

"We recognize that the rule is as stated in 43 C.J.S. Injunctions § 211, that an injunction decree must be as definite, clear and precise as possible and when practicable it should inform the defendant of the acts he is restrained from doing, without calling on him for inferences or conclusions about which persons might well differ and without leaving anything for further hearing. Nevertheless, we believe that when respondents are enjoined from operating their motor-passenger vehicles outside the corporate limits and suburbs of the City of El Paso, they will understand that when they pass out of those adjacent sections of the city which are used as places of residence by workers in the city into those sections which are used for farming, ranching or other essentially rural pursuits, they will be violating the injunction."

In Villalobos v. Holguin, supra, it will be noted that after using the general language in the first sentence of the above

quotation, the court found that when the respondents were enjoined from operating their motor-passenger vehicles outside the corporate limits and suburbs of the City of El Paso, they would know the meaning of the word "suburbs" and could determine what were the suburbs of the City of El Paso. They could reasonably understand and obey the injunction.

■ An injunction must be broad enough in its terms to prevent repetition of the evils sought to be stopped, whether the repetition be identical to that employed prior to the injunction or in a somewhat different form calculated to circumvent the injunction as written. We quote from San Antonio Bar Association v. Guardian Abstract & Title Company, 291 S.W.2d 697, 702, in which the Supreme Court of Texas, through Justice Garwood, after referring to the general language of the Villalobos v. Holguin case, supra, made this statement:

"But obviously the injunction must be in broad enough terms to prevent repetition of the evil sought to be stopped whether the repetition be in form identical to that employed prior to the injunction or (what is far more likely) in somewhat different form calculated to circumvent the injunction as written. And obviously, too, the decree cannot prejudge new situations, which were not before the court in the first instance, whether prejudging them as nonviolations or violations of its general terms. Nor should it be greatly concerned with rights of the defendants that are asserted largely in the abstract. Otherwise it would probably take longer to write the decree than it would to try the case, and the injunction might well become unintelligible and self-destructive."

In the case of Cottingham v. Engler, Tex.Civ.App. Dallas, 178 S.W.2d 148, 151, it was contended that the injunction decree was unenforceable because it failed to name those holding policies in the old agency on the date the agency was sold, and that appellants (defendants) who sold same, not being able to remember the 5,000 policyholders, might unwittingly solicit the renewal of policies in the old agency and violate the injunction. In overruling the contention, the Court made the following statement:

"Cottingham had been connected with the agency for nearly five years prior to the sale, and Barham had been with the agency as an employe for a considerable length of time before his resignation; in view of this situation, we do not think it unreasonable to assume that these gentlemen were sufficiently familiar with the business of the agency and its clientele as to avoid violating the injunction. * * * So, we conclude that, if appellants exercise ordinary care to avoid violating the injunction, no occasion will arise for its violation, either wittingly or unwittingly."

So, in the instant case, there will be no difficulty on the part of the appellants to understand and obey the injunction if they use just ordinary intelligence.

■■ Appellants' Points 4, 5, 6, and 7 are to the effect that the trial court erred in enjoining them as done in paragraphs 1, 3, 4, 5, 6, 7, and 8 of the order granting the temporary injunction, in that as a matter of law plaintiffs must prove that they own title to the property in question in order to restrain and prevent the defendants from doing the various acts set out in said paragraphs, and that one who does not own the property or does not have the possession of the same cannot restrain other persons from using such property, and also that the injunction dispossessed the defendants from the property in question and placed the plaintiffs in possession of the same, and changed the status quo.

In their petition the appellees alleged that as between them and the appellants they held the prior possession to all of the lands embraced within the Triple T Pasture. The testimony of Marcus Mauritz, one of the

appellees, was to the effect that he was manager and overseer of the Mauritz interests and was familiar with the Triple T Pasture since 1931. The Mauritzes pastured it with their own cattle from 1942 to 1945. Thereafter it was continuously leased for pasturage. Appellee Lee, who leased directly from the Mauritzes, had at the time of the trial about 140 head in the Triple T Pasture, of which about 55 were in the west enclosure. The testimony further showed that the Mauritzes held valid deeds to about 1,400 acres and leases on about 1,100 or 1,200 acres, holding a total acreage by ownership and leases of approximately 2,550 acres, including about 900 acres in the west enclosure. The testimony further showed that it was only in recent years beginning about 1952 or 1953, that the appellants acquired some of the 5-acre tracts in the west enclosure, and began grazing cattle thereupon.

The proof of the Mauritzes' prior possession of the Triple T Pasture was sufficient in and of itself to sustain the trial court's finding that the appellees were the owners and lessees of all the pasture except for the acreage (not more than 60.74 acres) claimed to be owned by or under lease to appellants, and except for about 25 acres found to belong to third persons. The doctrine of prior possession has been applied in common pasturage cases.

In Perry v. Stringfellow, 113 S.W.2d 1012, 1016, this Court, referring to the respective claims of plaintiffs and defendant to the pasturage rights, made this statement:

"This contest being for possession of land belonging to neither of the contestants, it must be determined by the rule that prior possession gives the better right. The idea is a mistaken one that this rule is a rule of evidence and nothing more. It is a rule of public policy as well. It enforces resort to courts, and not to self-help, to settle disputes involving the right of possession, and thereby prevents breaches of the peace. Under this rule, it would seem that, so late as 1929, Hudgins, as against all the world except the true owners of the 5-acre tracts located in the Hudgins pasture, had the superior right of possession."

See also Payton v. Loustalott, Tex.Com. App., 53 S.W.2d 1012, 1013, in which the court in a trespass-to-try-title suit, made this statement:

"Equally well settled is the doctrine that, where a plaintiff in an action of trespass to try title shows priority of possession of the land involved and no title is found in the defendant, the plaintiff by virtue of such possession is entitled to judgment. Kolb v. Bankhead, 18 Tex. [228], 229; Wilson v. Palmer, 18 Tex. 592; Alexander v. Gilliam, 39 Tex. [227], 228; Duren v. Strong, 53 Tex. 379; Williams v. Chew, Tex.Civ.App., 19 S.W.2d 68."

See also Garcia v. Tubbs, Tex.Civ.App., 300 S.W.2d 736, writ refused, n. r. e.

Appellants strenuously contend that the effect of the order granting the temporary injunction in the present case is to dispossess the appellants of property claimed by them and to change the status quo. They rely upon the opinion of the Commission of Appeals in Perry v. Stringfellow, 134 Tex. 328, 134 S.W.2d 1031. We are in accord with the general principles of law enunciated in the Perry v. Stringfellow case, and the other cases cited by appellants to like effect. However, the instant case is quite distinguishable from the case of Perry v. Stringfellow and the other cases cited by appellants. In Perry v. Stringfellow the court enjoined the defendant from pasturing more than 3 head of cattle in the enclosure, and also enjoined the defendant from in any manner preventing plaintiffs from expelling some 200 head of defendant's cattle from said land in excess of 3 head. The court stated that this undoubtedly had the same effect as if a mandatory injunction had been issued in that pending the hearing on the permanent in-

junction it destroyed the status quo in so far as defendant's cattle were concerned.

In the instant case, there is no mandatory provision with respect to expelling any cattle from the land in question. Moreover, at the time of the trial and the order of temporary injunction there were only 7 head of cattle belonging to the appellants or any of them in the west enclosure to which the injunction applied. As stated by appellees in their brief, if such paragraph of the decree could be said to be mandatory in character, it would be a typical situation where the doctrine of "de minimis non curat lex" should apply. There is certainly nothing in the order granting the injunction which will prevent the appellants from fencing in their own lots and grazing as many cattle thereon as they want to graze.

Moreover, the court makes no mention in Perry v. Stringfellow of Article 1351a, Vernon's Ann.Penal Code of the State of Texas, Annotated, which has reference to pasturing more cattle or other livestock on a tract owned or leased by a person in a general enclosure than the tract or tracts owned or leased by him would reasonably pasture. Section 2–a of this Article enacted in 1945 gives, in addition to all other relief and remedies provided for in said section, the right to apply for an injunction in the proper court against any person or persons violating any of the provisions of the Act. Under the decisions in this State, we feel it is unnecessary for the appellees to rely upon Art. 1351a and that they are entitled to the relief sought by them regardless of whether such Article is applicable in the instant case.

Appellants' Points 8 and 9 have been sufficiently covered in the discussion of the other points of error assigned by appellants, and the same, together with all their other points, are overruled.

The judgment of the trial court temporarily enjoining the Griffiths is affirmed, but as to the appellants J. S. Trahan and Jimmy Trahan it is reversed and the temporary injunction is dissolved.